[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14854

_____

D.C. Docket No. 1:13-cv-01579-ELR

TRACI MOULTRIE,

Plaintiff-Appellant,

versus

GEORGIA DEPARTMENT OF CORRECTIONS,
SHARON CASHIN,
in her individual capacity
MARCIA MCINTYRE,
in her individual capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 10, 2017)

Before CARNES and FAY, Circuit Judges, and GOLDBERG,[*] Judge.

GOLDBERG, Judge:

Traci Moultrie appeals[1] the district court's grant of summary judgment in favor of the Georgia Department of Corrections ("DOC"), Sharon Cashin, and Marcia McIntyre[2] in her employment discrimination and retaliation suit brought under 42 U.S.C. §§ 1981, 1983, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Moultrie argues that the district court erred in finding that: (1) Moultrie failed to establish the causation element of a prima facie retaliation claim; (2) Moultrie failed to demonstrate that similarly situated employees were treated differently; (3) Moultrie failed to present a 'convincing mosaic' of discrimination or retaliation; and (4) Cashin and McIntyre were entitled to qualified immunity. After careful review, we affirm.

## BACKGROUND

In July of 1999, Moultrie, an African-American woman, began work as a probation officer at the DOC's office in Lawrenceville, Georgia. In 2009, another probation officer filed a grievance accusing Clark Arick, also a probation officer,

---

[*] The Honorable Richard W. Goldberg, Judge for the United States Court of International Trade, sitting by designation.

[1] There were two plaintiffs before the district court, but only Moultrie seeks appellate review.

[2] Moultrie initially named Michael Kraft as an additional defendant but the parties consented to dismiss him.

2

of racial discrimination.  The grievance coordinator emailed Michael Kraft, the Field Operations Manager, to inform him of this grievance.  Moultrie later filed her own grievance against Arick for racially discriminatory treatment.  In 2010, internal affairs investigated Arick's behavior.  Arick resigned before the investigation ended.

In April of 2009, Cashin became Chief Probation Officer in Lawrenceville.  During Cashin's tenure, she participated in offering promotions and special assignments.  Moultrie received no promotions or special assignments, despite being qualified.  Then, in August of 2011, Moultrie fractured her knee during field officer training.  As a result, she was unable to shoot her gun for her annual recertification exam.  Cashin required Moultrie to give up her gun and her "police powers card" until she could pass the test.  On January 20, 2012, Moultrie filed a grievance against Cashin.  In the grievance, she explained that Cashin allowed other officers to retest without forfeiting their weapons.  Moultrie also said that she believed Cashin passed her over for promotions and special assignments in favor of less experienced white officers.[3]  Moultrie concluded that Cashin was retaliating against her for her complaint against Arick.

---

[3] When she filed her grievance, Moultrie believed that less experienced white officers received promotions and special assignments over her.  However, Moultrie admitted in her summary judgment papers that African-American men and women and white men and women all received special assignments during Cashin's tenure.  Further, the parties agreed that one promotion went to a Hispanic man during Cashin's tenure.  A second promotion went to an African-American woman, but because she received her promotion upon transferring from

On March 13, 2012, Cashin issued Moultrie a letter of instruction for failing to turn in leave slips after returning to work from sick leave. On March 21, Moultrie filed a second grievance against Cashin, complaining that Cashin issued the letter of instruction to retaliate for Moultrie's January grievance against Cashin. On April 17, Cashin issued a letter of concern to Moultrie for sending text messages containing "slanderous gossip" about a meeting that Cashin attended. Cashin also asked Moultrie to explain her involvement in two cases. Moultrie believed that Cashin did not ask white officers to explain their actions in the same cases. On May 1, Moultrie filed a third grievance against Cashin for racial discrimination and retaliation based on these incidents.

Meanwhile, on January 11, 2012, Moultrie had issued a warrant for the arrest of a probationer. In May of 2012, the probationer was arrested and extradited from Michigan to Georgia. But it turned out that the probationer had already served the rest of his sentence in jail. Cashin told McIntyre[4] of the wrongful arrest and forwarded the materials concerning the wrongful warrant. McIntyre reviewed the materials and determined that "Moultrie prepared the

---

another office, the parties disputed Cashin's role in that promotion. The parties also disputed whether there was a third promotion during Cashin's tenure. The defendants said there were no more promotions. Moultrie claimed a third promotion went to a white person, but she could not recall who received the promotion.

[4] McIntyre became the Field Operations Manager and Cashin's supervisor in January of 2012.

4

probation warrant without adequately investigating the violations that provided the basis for the warrant." Specifically, McIntyre found that Moultrie did not attempt to locate or contact the probationer, review his file, or review the SCRIBE notes[5] on the case before submitting a warrant for the probationer's arrest. McIntyre noted that the probationer's file was in the "closed" file cabinet, and that the SCRIBE notes stated, "jail court revocation held 03/11/2009..def balance revoked to the state penal system…copy of petition given PO3 for obts…mod form completed this date…file place in closed cases…ts." In short, McIntyre found that Moultrie's actions "were negligent and constituted a failure to perform her job duties."

In mid-June McIntyre made her initial recommendation to terminate Moultrie. On June 21, internal affairs began an investigation into Moultrie's grievances against Cashin. Cashin testified that she first learned of Moultrie's grievances in June, when internal affairs notified her of an investigation. Cashin then immediately told McIntyre. McIntyre terminated Moultrie after internal affairs finished its investigation. McIntyre testified that she knew of neither the grievances nor the investigation before she initially decided to terminate Moultrie.

---

[5] SCRIBE notes are case note entries about individual probationers.

## DISCUSSION

We review *de novo* a district court's grant of summary judgment, "taking all of the facts in the record and drawing all reasonable inferences in the light most favorable to the non-moving party." *Peppers v. Cobb Cty.*, 835 F.3d 1289, 1295 (11th Cir. 2016). We draw those inferences only if they are supported by the record. *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010).

"Summary judgment is proper where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Peppers*, 835 F.3d at 1295 (quoting Fed. R. Civ. P. 56). A fact is "material" if it "might affect the outcome of the suit," and a dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Id.* at 252, 106 S. Ct. at 2512. In the end, we will grant summary judgment if a reasonable jury could not find for the nonmoving party by a preponderance of the evidence. *Id.*

## I.    The Causation Element of a Retaliation Claim

To establish a prima facie case of retaliation, a plaintiff must show: (1) statutorily protected activity; (2) a materially adverse action; and (3) a causal link between the protected activity and the adverse action. *Goldsmith v. Bagby*

6

*Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  "We construe the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Id.* at 1278 (citation omitted).  But a plaintiff must at least show that the decision maker was aware of the protected activity when she made the adverse employment decision.  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999).  The plaintiff can make this showing using circumstantial evidence.  *Id.*

The district court found that Moultrie failed to establish the causation element of a retaliation claim because (1) her 2009 grievance against Arick was made too long before the adverse actions taken against her; and (2) Cashin and McIntyre were unaware of her 2012 grievances before they took adverse actions against her.

Moultrie argues that a jury should decide whether McIntyre and Cashin were aware of the grievances Moultrie filed before they took adverse actions against her.  She posits that the short interval between her grievances and the subsequent adverse actions is circumstantial evidence that McIntyre and Cashin knew of her grievances.  Moultrie is right that "'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'"  *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (citation omitted).  But if the decision maker "unequivocally denie[s] being aware" of the

7

protected activity, close temporal proximity alone fails to establish a causal link. *See Clover*, 176 F.3d at 1354–56. Instead, the plaintiff must also present circumstantial evidence, and "not mere speculation," to rebut the decision maker's denial of awareness. *Id.*

Cashin and McIntyre both unequivocally denied awareness of Moultrie's grievances. Cashin testified that she first learned of the grievances when the internal investigation began, well after she issued her letters of concern and decided not to promote Moultrie. And McIntyre testified that she first learned of the grievances after she decided to terminate Moultrie. As a result, Moultrie must present evidence to rebut the denials of Cashin and McIntyre.

Moultrie cites evidence that internal affairs would sometimes informally divulge information about grievances to supervisors in McIntyre's position. As explained above, a grievance coordinator once emailed Kraft when he was in McIntyre's position to provide information and ask questions about two grievances. Further, during Kraft's deposition, the lawyer deposing Kraft stated, "Let's say there were repeated issues, like there were with Mr. Arick, where it would almost be negligent for the grievance coordinator not to give you a heads up that something's happening on the ground and you might need to check it out." Kraft replied, "Right," counsel responded, "Right?" and Kraft again confirmed, "Right." In addition, Cashin and McIntyre regularly spoke about administrative

matters, potentially giving them a chance to discuss any acquired knowledge of grievances.[6]  Moultrie argues that the foregoing evidence is sufficient to allow a reasonable jury to find that, before taking any adverse action, McIntyre or Cashin or both learned of Moultrie's grievances through an "informal process of notification."

We disagree.  Internal affairs had a procedure of withholding the substance of grievances until the start of an investigation.  Moreover, both Cashin and McIntyre explicitly denied that they learned of Moultrie's grievances prior to any adverse actions—a denial consistent with the protocol of internal affairs.  To refute this evidence, Moultrie focuses on two instances in the record.  One instance is an email from a different grievance coordinator to a different Field Operations Manager, sent years before Moultrie's grievances.  The other instance is Kraft's *possible* affirmation that, if "repeated issues" exist, "it would be almost negligent for the grievance coordinator" to fail to notify the Field Operations Manager of the issues.  Taken together, this scintilla of evidence "shows, at most, that [a grievance coordinator] could conceivably have told [McIntyre] about" Moultrie's grievances, and McIntyre could conceivably have told Cashin.  *Clover*, 176 F.3d at 1355.  "But

---

[6] Moultrie's other relevant evidence about Cashin—that Cashin knew of Moultrie's grievance against Arick in 2009—is not sufficient because there was too much time between the investigation into that grievance in 2010 and Cashin's alleged retaliatory actions against Moultrie in 2012.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that, without more evidence supporting a causal link between a protected action and an adverse action, even "[a] three to four month disparity . . . is not [close] enough" to prove a causal link).

because 'could have told' is not the same as 'did tell,' it would be pure speculation to infer that [a grievance coordinator] actually told [McIntyre] about [Moultrie's grievances.]" *Id.* And speculation will not allow a reasonable jury to find that either Cashin or McIntyre knew of Moultrie's grievances before they took adverse actions. Therefore, no genuine dispute exists as to their awareness and the district court correctly granted summary judgment on Moultrie's retaliation claim.

## II.    Similarly Situated Employees in a Discrimination Claim

Moultrie cited circumstantial evidence to prove her discrimination claim. "Racial discrimination claims based on circumstantial evidence are evaluated under the *McDonnell Douglas* burden shifting framework." *Burke-Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam). Under that framework, a plaintiff must first establish a prima facie case of discrimination. *Id.* A plaintiff does this "by proving that (1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). If the plaintiff establishes a prima facie case, "the defendant must show a legitimate, non-discriminatory reason for its employment action." *Burke-Fowler,* 447 F.3d at 1323. If the defendant satisfies that burden, "the plaintiff must prove

that the reason provided by the defendant is a pretext for unlawful discrimination." *Id.*

On appeal, the primary dispute concerns the third element of the prima facie claim of discrimination: namely, whether Moultrie established that defendants treated more favorably similarly situated employees outside her classification. When a plaintiff compares herself to employees of a different classification, she must show that the employees are similarly situated to her "in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present*." *Wilson*, 376 F.3d at 1092 (citation omitted).

The district court found that Moultrie identified employee misconduct that was not "nearly identical in quality and quantity" to hers. Accordingly, the district court concluded that Moultrie failed to establish a prima face case of discrimination. For the same reason, the court also held that, even if Moultrie could establish a prima facie case, she could not show that defendants' cited

reasons for her dismissal were pretextual. The court thus entered summary judgment against Moultrie.

Moultrie now argues that the district court too rigidly analyzed whether she was similarly situated to other employees. She contends that she was similarly situated to three white employees who were not fired for similar misconduct: Denise Fagge, Dawn Morahan, and Barbara McLane.

First, Fagge left a probationer in custody for eleven months before scheduling a hearing. She admitted that she "lost the probationer in the shuffle." In response, the Field Operations Manager, then Kraft, reduced Fagge's pay by five percent for six months. Second, Morahan placed a man in prison for nine months, even though the man's case had expired. However, multiple tolling periods complicated the case, and Morahan made a mathematical error. Kraft also reduced Morahan's pay by five percent for six months. Third, McLane issued a warrant for a probationer whose case had been terminated. In an affidavit, McLane explained that she reviewed the first few pages of the SCRIBE notes and noticed that the case was active, but did not review enough entries to reach one that "should have caused [her] to investigate the matter further." After the probationer's wife told McLane that the probation had been revoked, McLane discovered that the revocation had not been properly entered into the SCRIBE system. Defendants did not discipline McLane.

12

The DOC terminated Moultrie for "negligence and inefficiency in performing duties." Specifically, McIntyre found that Moultrie did not attempt to locate or contact the probationer, review his file, or review the SCRIBE notes on his case before submitting a warrant for the probationer's arrest. McIntyre noted that the probationer's file was in the "closed" file cabinet, and the SCRIBE notes stated, "jail court revocation held 03/11/2009..def balance revoked to the state penal system…copy of petition given PO3 for obts…mod form completed this date…file placed in closed cases…ts." Moultrie states that she noticed the case was listed as active in the SCRIBE system, and attempted to find the hard file but could not locate it in the disorganized file room. Relying on the "active" listing in the SCRIBE system, and without reading the SCRIBE notes, she issued the warrant.

With that in mind, we must decide if Moultrie's infraction is different in quality from the infractions of the three employees.[7]

To begin, Fagge's infraction was different from Moultrie's. Fagge failed to schedule a hearing, while Moultrie wrongfully issued an arrest warrant. An employee "not accused of the same or similar conduct . . . is not similarly

---

[7] The record indicates that Moultrie and the three other employees each committed one incident, so the quantity is the same for all four employees. *See Maniccia*, 171 F.3d at 1369 (noting appellant committed four violations while comparators only committed one).

13

situated." *Holifield*, 115 F.3d at 1563. Fagge is not a similarly situated comparator.

But like Moultrie, both Morahan and McLane authorized improper warrants. Even so, their actions were notably different from Moultrie's. Morahan properly used the SCRIBE notes but made a math error in calculating the complex tolling periods. In fact, McIntyre testified that when she recommended to Kraft that Moultrie be terminated, she explicitly distinguished Morahan's situation and lighter punishment from Moultrie's. She noted that Morahan made "a mathematical error," which "was something that any of us could do," while Moultrie missed "a clear SCRIBE entry that said the case had been . . . revoked in full." Thus, there was a difference in quality between Morahan's and Moultrie's incidents, because Morahan took the proper steps to do her job but made a mistake doing it, while Moultrie never even took those steps to do her job.

Similarly, McLane's mistaken warrant was the result of another person's failure to enter the probationer's revocation in the SCRIBE notes. McLane took the proper step of looking through the SCRIBE notes before issuing the warrant. Had she looked further into the SCRIBE notes, the note she missed still would not have told her that the parolee's probation had been revoked. Instead, she would have had to do more research to reach the correct result. Moultrie, on the other

hand, did not even review the SCRIBE notes.[8]  If she had, she would have seen that the probation had been revoked.  Unlike Morahan and McLane, Moultrie failed to take the basic steps that would have prevented her from issuing a mistaken arrest warrant—a qualitatively worse infraction.

Therefore, the district court correctly determined that Moultrie identified no similarly situated employees whose misconduct was nearly identical to hers in quality.  *See Maniccia*, 171 F.3d at 1368–69.  Because Moultrie failed to establish a prima facie case of discrimination, we decline to consider the third *McDonnell Douglas* step—whether the defendants' reasons for firing her were pretextual.

## III.    Convincing Mosaic of Circumstantial Evidence

Establishing the elements of the *McDonnell Douglas* framework is not the only way for a plaintiff to survive summary judgment in an employment discrimination case.  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  A plaintiff can still survive summary judgment if she "presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"  *Id.* (citation omitted).

The district court began its "convincing mosaic" analysis by detailing the circumstantial evidence in *Smith*.  The court then contrasted *Smith* with Moultrie's interactions with Arick and Cashin, complaints of other employees, and the

---

[8] Moultrie does not dispute that she did not review the SCRIBE notes, claiming that she looked to the SCRIBE system only to check that it listed the case as active.

15

timeline of events preceding Moultrie's termination.  The court concluded that Moultrie "failed to present a 'convincing mosaic' of discrimination."

On appeal, Moultrie merely cites the "convincing mosaic" standard and states, "Moultrie has most certainly presented that mosaic."  But Moultrie's evidence is weaker than the evidence in *Smith*, where the plaintiff demonstrated a motive to discriminate, incidents of white and black employees being treated differently, and the employer's conscious tracking of race in disciplinary decisions. *Smith*, 644 F.3d at 1329–46; *see also Connelly v. Metro. Atlanta Rapid Transit Auth.*, 764 F.3d 1358, 1364–65 (11th Cir. 2014).  As set out above, Moultrie has not offered enough evidence to show that defendants treated white and black employees differently.  Therefore, Moultrie failed to present sufficient evidence of a convincing mosaic of discrimination.

## IV.    Qualified Immunity

"Qualified immunity protects government officials . . . . [unless] an official's conduct violates clearly established statutory or constitutional rights . . . ." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1282 (11th Cir. 2008) (citation omitted).  The district court found that Moultrie "failed to present sufficient evidence to show that any of the defendants' conduct was a constitutional violation, and thus qualified immunity provides an independent basis for granting summary judgment in favor of defendants."  Moultrie insists that defendants "lack qualified immunity, because

their discrimination and retaliation against Moultrie violated clearly established law." Yet, as explained above, we too find that Moultrie provided insufficient evidence of any statutory or constitutional violations and, therefore, we too find that qualified immunity is an additional basis for granting summary judgment in favor of defendants.

## V.    Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment against Moultrie.

**AFFIRMED**.